

21st Floor
1251 Avenue of the Americas
New York, NY 10020-1104

**Robert D. Balin**
(212) 489-8230 tel
(212) 489-8340 fax

robbalin@dwt.com

August 29, 2018

**VIA ECF**
Honorable Vernon S. Broderick
United States District Court
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square, Room 415
New York, New York 10007

> Re:    *United States of America v. John Ashe, et al.*, No. 1:15-cr-00706 (VB)
>        <u>Letter Motion Requesting Access to Materials Related to Identity of "CC-3"</u>

Dear Judge Broderick:

This firm submits this letter motion pursuant to Rule 3 of Your Honor's Individual Rules & Practices in Criminal Cases on behalf of Fairfax Media Limited ("Fairfax") and the Australian Broadcasting Corporation ("ABC") (collectively, the "News Organizations"). Fairfax and ABC provide coverage of Australian and international news, including events related to the above-referenced criminal proceedings (the "Ashe Proceedings"). As attorneys for the News Organizations, we write to request public access to a limited subset of documents from the Ashe Proceedings pertaining to the identity of unindicted co-conspirator "CC-3", who is widely reported to be Chinese-Australian billionaire, Dr. Chau Chak Wing. Specifically, we request access to the following:

- The cable from the U.S. State Department to the Embassy of Antigua and Barbuda, dated January 6, 2016, which is attached to the filed Sentencing Submission of Shiwei Yan as Exhibit #3 (Doc. No. 219-4) (the "State Department Cable"). Specifically, we request release of a copy of the State Department Cable removing the redaction of the name of "CC-3" that appears in paragraph 9 on page 6 of the exhibit. A copy of the redacted State Department Cable that was publicly-filed with the Court is attached hereto as Exhibit A.

- All e-mails, bank records, wire records, or other documents contained in search warrant returns obtained from Ms. Yan, Heidi Hong Piao, John Ashe, or any other individual or institution, that evidence the $200,000 wire transfer payment made by one of "CC-3's" companies to Ashe, referenced in Paragraph 49 (including subparts (a)-(g)) of the Complaint in the Ashe Proceedings (Doc. No. 1). A copy of the Complaint in the Ashe Proceedings is attached hereto as Exhibit B.

Hon. Vernon S. Broderick
August 29, 2018
Page 2

- Any portion of the United States Probation Office's Presentence Investigation Report ("PSR") relating to Ms. Yan that discloses the name of CC-3 and any attachments to the PSR that contain e-mails, bank records, or wire transfer documents evidencing the $200,000 payment made by CC-3's company to Ashe.

The information requested by Fairfax and ABC is absolutely critical and needed by the News Organizations to adequately defend themselves in an ongoing Australian libel proceeding brought by Dr. Chau against the News Organizations. In that Australian libel case, Dr. Chau alleges that a television news program co-produced by the News Organizations falsely reported that Dr. Chau "paid a $200,000 bribe to the President of the General Assembly of the United Nations [Ashe]." Amended Statement of Claim ¶ 5(g), *Chau Chak Wing v. Australian Broad. Corp. & ORS*, File No. NSD1088/2017 (New South Wales Registry – Fed. Ct. of Australia), attached hereto as Exhibit C. The information sought by the News Organizations is narrowly focused, implicates no privacy or investigatory concerns, goes to the very heart of Dr. Chau's libel claim, and is of paramount importance to the News Organizations' defenses in the Australian libel proceeding.

## FACTUAL BACKGROUND

### A.    The News Organizations Seek Public Access to a Limited Set of Documents Related to "CC-3"

The documents to which the News Organizations seek public access relate only to the prosecutions of two of the defendants in the Ashe Proceedings – Shiwei Yan and Heidi Hong Piao – and concern only one of the overt acts outlined in the Complaint. Specifically, the Complaint in the Ashe Proceedings charged that "Yan and Piao arranged for a $200,000 wire to a bank account belonging to the President of the UN General Assembly [John Ashe] from another co-conspirator not named as a defendant herein in exchange for the President attending a private conference in his official capacity." *See* Exhibit B ¶ 3(d). The Complaint identifies this other co-conspirator only as "CC-3" and describes him as a "Chinese real estate developer." Exhibit B ¶ 49. On January 20, 2016, Yan pled guilty to one count of bribery set forth in a Superseding Information; and on July 29, 2016, Yan was sentenced to 20 months in prison.[1] On January 14, 2016, Piao pled guilty to five counts (conspiracy to commit bribery; bribery; conspiracy to commit money laundering; money laundering; and willful failure to file reports of foreign bank and financial records) set forth in a Superseding Information; and Piao is scheduled to be sentenced on October 25, 2018. *See* Doc. No. 749. The bribery conspiracy allegations in the Complaint do not relate to any other defendant except John Ashe, who passed away June 22, 2016.

---

[1] *See* Press Release, Dep't of Justice, U.S. Attorney's Office, Southern District of New York, *Former Head of Foundation Sentenced to 20 Months in Prison for Bribing Then-Ambassador and President of United Nations General Assembly* (July 29, 2016), https://www.justice.gov/usao-sdny/pr/former-head-foundation-sentenced-20-months-prison-bribing-then-ambassador-and-president.

4843-8269-9121v.1 0108234-000001

Hon. Vernon S. Broderick
August 29, 2018
Page 3

Documents filed with the Court in the Ashe Proceedings indicate that the government likely obtained and executed search warrants in the course of its investigation of Mr. Ashe, Ms. Yan, Ms. Piao and others. Specifically, Paragraph 49 (including subparts (a)-(g)) of the Complaint identifies various e-mails between and among Ms. Piao, Ms. Yan, Mr. Ashe, and "CC-3," suggesting that that e-mail evidence was obtained as part of the investigation via search warrants. Exhibit A ¶ 49. Additionally, Paragraph 49(f) of the Complaint charges that Mr. Ashe's bank account "received a $200,000 wire from China from one of CC-3's companies," suggesting that wire transfer documents and/or bank records were obtained via search warrant from one or more of the defendants or from their financial institutions. *Id.*

While the Complaint in the Ashe Proceedings does not itself disclose the identity of co-conspirator CC-3, Ms. Yan attached as Exhibit 3 to her Sentencing Submission a State Department Cable (*see* Doc. No. 219-4). In that cable, dated January 6, 2016, the U.S. State Department requested that the Government of Antigua and Barbuda waive any immunity from prosecution Mr. Ashe might enjoy with regard to the acts listed in Attachment A to the cable. In turn, paragraph 9 of Attachment A to the cable identified the following act by Ashe: "Accepting an invitation to attend, attending, and speaking at a November 2013 conference, organized by [REDACTED IN PUBLICLY FILED DOCUMENT] (referred to as CC-3 in the Complaint and Indictment) in Guangzhou, China." (Doc. No. 219-4, Attachment A ¶ 9.) The News Organizations believe that the State Department Cable filed as Exhibit 3 to Ms. Yan's Sentencing Submission may have been provided to the Court without redactions under seal pursuant to the Court's Protective Order entered November 12, 2015 (Doc. No. 86).

Finally, documents filed with the Court also suggest that the U.S. Probation Office's PSR which was submitted to the Court in connection with Ms. Yan's sentencing hearing may have also possibly disclosed the name of CC-3 or attached relevant e-mails or wire transfer documents relating to the $200,000 payment from CC-3's company to Ashe. Specifically, page 6 of the Government's Sentencing Memorandum for Ms. Yan observes that:

> Yan agreed to and did arrange for $200,000 to be sent to Ashe by a Chinese real estate developer ("CC-3") in return for Ashe making an official appearance, as PGA [President of the UN General Assembly], at a conference in China arranged by the real estate developer. (PSR ¶¶ 48-53.) To facilitate the visit seeming legitimate, at the request of the defendant and co-defendant Piao, Ashe submitted a letter to CC-3 asking for arrangements to be made through his alleged "Advisor on Economic Matters, Ms. Shiwei Yan," and back-dated a letter of appointment to match. (PSR ¶¶ 51-52.)

(Doc. No. 227, at 6.)

Undersigned counsel has spoken with counsel for Yan and Piao, both of whom stated that they take no position with respect to the News Organizations' request for public access to these documents, but would be guided by the position taken by the U.S. Attorney's Office.

Hon. Vernon S. Broderick
August 29, 2018
Page 4

**B.      The News Organizations Request Access to Defend Against a Libel Suit**

The News Organizations require access to these documents to adequately defend themselves in an Australian libel proceeding and to avoid a substantial deprivation of due process.  On June 5, 2017, the television news magazine *Four Corners* broadcasted an episode, jointly produced by Fairfax and the ABC, titled "Power and Influence."  The newscast reported that "CC-3," the unnamed co-conspirator whose company paid $200,000 to Mr. Ashe to attend the private conference in China, was Dr. Chau Chak Wing.  Specifically, the program reported that "[t]he FBI alleged that Yan bribed the UN General Assembly President to speak at [the luxury Imperial Springs Resort], at a conference hosted by Dr. Chau.  A sealed indictment from a New York Court against Sheri Yan refers to Dr. Chau using a codename – CC-3."  The newscast made clear that while "under U.S. bribery law it was illegal for Ashe, as a UN official, to receive this payment," "[t]here is no suggestion Dr. Chau knew it was illegal."[2]

Nonetheless, Dr. Chau sued the News Organizations for libel in the Federal Court of Australia claiming that the newscast falsely states that he paid a $200,000 bribe and that he was knowingly involved in the corrupt scheme.  *See Chau Chak Wing v. Australian Broad. Corp. & ORS*, File No. NSD1088/2017 (New South Wales Registry – Fed. Ct. of Australia).  Exhibit C ¶ 5(g) and (h).  The News Organizations need the requested information to defend themselves in the Australian libel litigation.  Indeed, confirming through the actual Court documents at issue that Dr. Chau is "CC-3" and that he was involved in the $200,000 payment to Ashe (which led to the bribery pleas of Ms. Yan and Ms. Piao) is of paramount importance to the News Organizations' defense in the libel suit and will vindicate the free press from any attempt by Dr. Chau to silence truthful journalism.

Whatever privacy or investigatory interests might have justified the initial non-disclosure of CC-3's name in the Ashe Proceedings have long since vanished.  Both Ms. Yan and Ms. Piao have pled guilty to bribing Ashe via the $200,000 payment made by CC-3's company, Mr. Ashe is dead, and Dr. Chau has put his name directly in issue by bringing a libel suit claiming that it was false and defamatory for the News Organizations to have identified him as CC-3.  We further note that on May 22, 2018, Andrew Hastie, Chairman of the Joint Committee on Intelligence and Security for the Australian Parliament, stated on the floor of Parliament that Dr. Chau is the "CC-3" referenced in the Complaint in the Ashe Proceedings.  MP Hastie's statement identifying Dr. Chau as CC-3 has been widely reported by numerous news organizations in Australia, the United States, and around the world.[3]

---

[2] "Power and Influence," *Four Corners* (June 5, 2017), http://www.abc.net.au/4corners/power-and-influence-promo/8579844.  *See also* Exhibit C, Annexure A thereto, ¶¶ 118, 119 (Written transcript of *Four Corners* episode).

[3] *See, e.g.*, Emily Baumgaertner & Jacqueline Williams, *In Australia, Fears of Chinese Meddling Rise on U.N. Bribery      Case      Revelation*,      N.Y.      TIMES      (May      22,      2018), https://www.nytimes.com/2018/05/22/world/australia/bribery-un-china-chau-chak-wing.html; Amy Remeikis & Katharine Murphy, *Chinese-Australian billionaire involved in UN bribery case, MP claims*, THE GUARDIAN
4843-8269-9121v.1 0108234-000001

Hon. Vernon S. Broderick
August 29, 2018
Page 5

## ARGUMENT

### A.   The News Organizations Have A Right To Seek Disclosure of Court Documents

Openness is "an indispensable attribute" of our judicial system. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569 (1980). It guards against unfairness and inequity in the application of laws, as "the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known." *Press-Enter. Co. v. Superior Ct.*, 464 U.S. 501, 508 (1984) ("*Press-Enterprise I*"). Furthermore, broad access to criminal proceedings "contribut[es] to the public's perception of fairness in the criminal justice system and 'heighten[s] public respect for the judicial process.'" *United States v. Doe*, 63 F.3d 121, 126 (2d Cir. 1995) (quoting *Globe Newspapers Co. v. Superior Ct.*, 457 U.S. 596, 606 (1982)). As the U.S. Supreme Court has explained, "[p]eople in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Richmond Newspapers*, 448 U.S. at 572.

It is well settled that members of the press and public have a right to intervene in a judicial proceeding for the limited purpose of seeking unsealing of court records and proceedings, and "must be given an opportunity to be heard." *Globe Newspaper*, 457 U.S. at 609 n.25 (citation omitted). Moreover, these First Amendment guarantees unquestionably apply to members of the foreign media such as the News Organizations. *See Times Newspapers Ltd. v. McDonnell Douglas Corp.*, 387 F. Supp. 189, 192 (C.D. Cal. 1974); *Mireskandari v. Daily Mail & Gen. Tr. PLC*, No. CV-12-02943-MMM, 2013 WL 12114762, at *6 (C.D. Cal. Oct. 8, 2013). Indeed, numerous courts have specifically recognized that foreign news organizations have standing to request access to, inspect, and copy judicial records in American proceedings. *See, e.g.*, *United States v. James*, 663 F. Supp. 2d 1018, 1020 (W.D. Wash. 2009) (holding Canadian Broadcasting Company had standing under First Amendment and common law to intervene and move to unseal documents in criminal case); *United States v. Ferris*, No. CR-09-0037-LRS, 2009 WL 3672072, at *1 (E.D. Wash. Nov. 4, 2009) (holding Canadian Broadcasting Company had common law right to intervene and move to unseal documents in criminal case); *In re Thow*, 392 B.R. 860 (W.D. Wash. 2007) (same in bankruptcy case).

---

(May 22, 2018), https://www.theguardian.com/world/2018/may/22/chinese-australian-billionaire-involved-in-un-bribery-case-mp-claims; Associated Press, "Australian lawmaker accuses billionaire in UN bribe scandal," Fox News (May 23, 2018), http://www.foxnews.com/world/2018/05/23/australian-lawmaker-accuses-billionaire-in-un-bribe-scandal.html.

Hon. Vernon S. Broderick
August 29, 2018
Page 6

**B.      The First Amendment and Common Law Support Public Disclosure of the Requested Documents**

There is a long-standing right of access under the Constitution and the common law to criminal court files, such as those in the Ashe Proceedings. In *Richmond Newspapers*, the Supreme Court emphasized that a presumption of openness has "long been recognized as an indispensable attribute of an Anglo-American trial." 448 U.S. at 569. "From this unbroken, uncontradicted history, supported by reasons as valid today as in centuries past, we are bound to conclude that a presumption of openness inheres in the very nature of a criminal trial under our system of justice." *Id.* at 573. The Supreme Court later instructed that this federal constitutional presumption of public access applies not only to trials, but also to pre-trial criminal proceedings. *See, e.g., Press-Enterprise I*, 464 U.S. at 505-08; (voir dire); *Waller v. Georgia*, 467 U.S. 39, 47 (1984) (suppression hearing); *Press-Enter. Co. v. Superior Ct.*, 478 U.S. 1, 12-13 (1986) ("*Press-Enterprise II*") (preliminary hearing). And critically here, this First Amendment presumption of openness applies to criminal court records in addition to the proceedings themselves. *In re of N.Y. Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987).

While the First Amendment right of access to criminal proceedings is not absolute, where the First Amendment access right applies, the constitutional presumption in favor of access requires "the most compelling circumstances" to justify any restriction upon that right. *In re Application of Nat'l Broad. Co.*, 635 F.2d 945, 952 (2d Cir. 1980). Proceedings may be closed and documents may be sealed only if "specific, on the record findings are made" demonstrating that "closure is essential to preserve higher values;" that those values would be prejudiced absent secrecy; that the closure is narrowly tailored; and that there are no less restrictive alternatives. *Press-Enterprise II*, 478 U.S. at 13-14; *In re N.Y. Times*, 828 F.2d at 116.

The public and media also have a common law right of access to judicial records and documents. *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597-98 (1978) ("It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents."). This common-law presumption is intended to promote accountability in the judicial process and to encourage public confidence in the administration of justice. *See, e.g., Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). The common law right of access applies to all "judicial documents" – i.e., documents which are "relevant to the performance of the judicial function and useful in the judicial process." *Id.* at 119, 120.

Where judicial documents are at issue, the Court must determine the weight to be given the presumption of access along a continuum. Generally, where, as here, the information "directly affects an adjudication," the presumption of access is very high and may only be overcome by "extraordinary circumstances." *Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, 814 F.3d 132, 142 (2d Cir. 2016) (internal citation and quotation marks omitted). Finally, once the Court has determined the weight of the presumption, it must "balance competing considerations against it." *United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir.

Hon. Vernon S. Broderick
August 29, 2018
Page 7

1995). Such countervailing factors typically include "the danger of impairing law enforcement or judicial efficiency" and "the privacy interests of those resisting disclosure." *Id.* But, "[c]ountervailing privacy interests are at the lowest for matters that have far-reaching 'public ramifications' and where there exists 'a fair opportunity for the subject to respond to any accusations contained therein.'" *United States v. Huntley*, 943 F. Supp. 2d 383, 387 (E.D.N.Y. 2013) (Weinstein, J.).

Here, the News Organizations request access to three categories of documents under the First Amendment and common law rights of access.

*First*, the News Organizations have both a First Amendment and a common law right of access to a copy of the State Department Cable, removing the redaction of CC-3's name from Paragraph 9 of Attachment A to the State Department Cable, since that cable was submitted to the Court for consideration at Ms. Yan's sentencing hearing as an exhibit to Ms. Yan's Sentencing Submission (Doc. No. 219-4, page 6, ¶ 9). Courts in this Circuit have routinely held that sentencing submissions are subject to both the First Amendment and common law rights of access. *See United States v. Dwyer*, No. 15-cr-385 (AJN), 2016 WL 2903271, at *1-2, (S.D.N.Y. May 18, 2016) (ordering filing of un-redacted sentencing submission by defense counsel, as well as letters of support from friends and family, on ECF); *United States v. King*, No. 10-cr-122 (JGK), 2012 WL 2196674, at *1-2 (S.D.N.Y. June 15, 2012) (access to sentencing submissions warranted because "[t]he defendant, the government and the public all have a right to know what information influences a judicial assessment of reasonable punishment") (quoting *United States v. Strevell*, No. 05-cr-477, 2009 WL 577910, at *4 (N.D.N.Y. Mar. 4, 2009)).

Here, the State Department Cable was attached as an exhibit to Ms. Yan's sentencing submission; therefore it is unquestionably subject to both the First Amendment and common law rights of access. There are simply no compelling circumstances that could justify restriction upon the First Amendment access right, and no extraordinary circumstances that could support abridging the common law right of access. First, it is clear on the face of the document that the subject redaction conceals only the name of CC-3. As noted above, it was widely reported in the press that Dr. Chau is CC-3 after it was disclosed on the floor of Australian Parliament. Thus, no privacy interest is at stake here, particularly since Dr. Chau has himself placed the identity and actions of CC-3 directly at issue in his libel suit against the News Organization. Second, the prosecutions of Ms. Yan, Ms. Piao, and Mr. Ashe have all concluded (with only the sentencing of Ms. Piao to be completed), meaning that the disclosure of CC-3's identity will not impair or impact any ongoing criminal case or investigation. When these now non-existent privacy and investigatory interests are weighed against the compelling interests that support disclosure, *i.e.*, the need of the News Organizations for critical evidence to defend themselves in the Australian libel proceeding brought by Dr. Chau, the News Organizations' access rights must prevail.[4]

---

[4] To the extent that the Court considers the identity of CC-3 to be "restricted information" as defined in section 1(e) of the Court's November 12, 2015 Protective Order, the News Organizations request, in light of the various
4843-8269-9121v.1 0108234-000001

Hon. Vernon S. Broderick
August 29, 2018
Page 8

*Second,* the News Organizations have both a common law and First Amendment right of access to e-mails, wire transfer records and other documents (as identified in Paragraph 49 of the Complaint) that may be included in search warrant returns for Ms. Yan, Ms. Piao, John Ashe, or any other individual or institution, and that relate to the $200,000 payment from CC-3's company to Ashe. The Second Circuit Court of Appeals and numerous district courts in this circuit have repeatedly held that the common law right of access applies to search warrant returns after the conclusion of an investigation. *See, e.g., In re Search Warrant*, No. 16-mc-00464 (PKC), 2016 WL 7339113, at *4-5 (S.D.N.Y. Dec. 19, 2016) (unsealing search warrant return for Subject 1 in Hillary Clinton e-mail investigation under common law right of access); *see also In re Application of Newsday, Inc.*, 895 F.2d 74, 79 (2d Cir. 1990) (finding that search warrant application is "a public document subject to a common law right of access" at the post-investigation stage); *In re Sealed Search Warrants Issued June 4 & 5, 2008*, No. 08-M-208 (DRH), 2008 WL 5667021, at *2 (N.D.N.Y. July 14, 2008) (finding search warrants, returns, applications, and supporting affidavits to be judicial documents).[5]

Likewise, in a particularly instructive case, the District Court for the District of Columbia held that both the common law *and* the First Amendment rights of access apply to post-investigation search warrant returns. *In re Application of N.Y. Times Co. for Access to Certain Sealed Court Records* (the "Anthrax Case"), 585 F. Supp. 2d 83, 88 (D.D.C. 2008).[6] There, the *New York Times* sought access to search warrant materials related to the investigation of the mailing of Anthrax to members of Congress and the media in the fall of 2001, including the search warrant executed against a military researcher implicated but ultimately cleared in the

---

considerations raised in this letter motion, that Your Honor modify the November 12, 2015 Protective Order to exclude the identity of CC-3 from the definition of "restricted information" and order the government and/or defendants' counsel to disclose to the News Organizations the materials requested herein. *See* Doc. No. 86. To the extent that the identity of CC-3 is *not* restricted information, the unredacted State Department Cable should be ordered disclosed because the redaction was improper under Your Honor's Individual Rules & Practices. Rule 10(c) of Your Honor's Rules provides that "Unless permission to the contrary is granted, every document in a sentencing submission . . . shall be filed in the public record." Individual Rules & Practices in Criminal Cases of Vernon S. Broderick, United States District Judge, Rule 10(c). These rules provide further that if a party redacts information from a sentencing submission beyond eleven enumerated categories of information identified in the Southern District's Privacy Policy (all of which are inapplicable here), it must file an application with the court concurrently with its sentencing submission. *Id.* at 10(d) & 10(e). No such application was made by Ms. Yan or the Government here. Therefore, redaction of the name of CC-3 in the State Department Cable was inappropriate and the name should be disclosed.

[5] Other federal courts of appeals have likewise found that search warrant materials are judicial records to which the common law right of access applies. *See In re Search of Fair Finance*, 692 F.3d 424, 433 (6th Cir. 2012) (stating that "the common law right of access to judicial documents may in some situations permit access to search warrant proceedings," including documents); *United States v. Business of Custer Battlefield Museum & Store*, 658 F.3d 1188, 1192 (9th Cir. 2011) (finding that common law right of access applies to search warrant materials after government's criminal investigation ends); *In re EyeCare Physicians of Am.*, 100 F.3d 514, 517 (7th Cir. 1996) (holding that common law right of access applies to search warrant affidavit).

[6] *See also In re Search Warrant for Secretarial Area Outside Office of Gunn*, 855 F.2d 569 (8th Cir. 1988) (holding First Amendment right of access applies to documents submitted in support of search warrant).

4843-8269-9121v.1 0108234-000001

Hon. Vernon S. Broderick
August 29, 2018
Page 9

Anthrax mailings.  585 F. Supp. 2d at 88.  After ruling that both access rights apply to post-investigation warrant materials, the court held that there was no compelling interest in continuing to keep these materials secret that could defeat the right of access.  The court found that the researcher's generalized privacy right to "get on with his life" did not outweigh the public's right of access considering that there was no danger of exposing an innocent third person to the media as the public already knew he was investigated and cleared in the anthrax attacks.  Furthermore, the researcher placed details concerning some of the searches at issue by filing a lawsuit against the DOJ.  *Id.* at 90-91, 93.

Just as the researcher was publicly known as a suspect in the Anthrax Case, Dr. Chau's name has been widely reported as CC-3 both in the media and on the floor of Australian Parliament.  Likewise, Dr. Chau has sued the News Organizations over their reporting that he is CC-3 and that his company paid $200,000 to Ashe, thus placing the contents of the search warrant returns directly at issue.  Moreover, the News Organizations seek only those documents from the search warrant returns that identify CC-3 and his involvement in the $200,000 payment to Ashe – i.e., the e-mails and wire transfer documents specifically referred to in paragraph 49 of the Complaint.  Ultimately, both Ms. Yan and Ms. Piao pled guilty to bribery charges related to these materials, and Mr. Ashe is deceased, so there is no danger of prejudicing any ongoing related criminal matter.  Simply put, the presumption of access is very strong here, with no countervailing interests warranting continued secrecy.  Accordingly, all e-mails, banking records, wire transfers, and other documents relating to the $200,000 payment to Ashe that are part of search warrant returns, including the specific documents referenced in Paragraph 49 of the Complaint in the Ashe Proceedings, should be publicly disclosed.

***Third,*** the News Organizations request public access to paragraphs 48-53 of the PSR that was submitted to the Court in connection with Ms. Yan's sentencing hearing and any e-mails, bank records or wire transfer documents evidencing the $200,000 payment that may have been attached to the PSR.  While the News Organizations recognize that disclosure of PSRs is generally disfavored, courts may disclose the contents of PSRs where, as here, there is a "compelling need for disclosure to meet the ends of justice."  *United States v. Charmer Indus., Inc.*, 711 F.2d 1164, 1176 (2d Cir. 1983).  District courts are vested with "a fair measure of discretion in weighing the competing interests in order to determine whether or not the person seeking disclosure [of a PSR] has shown that the ends of justice require disclosure."  *Id.* at 1177.

Here, disclosure of this limited portion of the PSR will satisfy the News Organizations' "compelling need for disclosure" without compromising the privacy interests of the criminal defendants or any third party, or interfering with any ongoing criminal trial.  As noted above, the News Organizations have a compelling need for disclosure of the identity of CC-3, and his involvement in the $200,000 bribe made by Ms. Yan and Ms. Piao to Ashe, in order to defend against Dr. Chau's libel lawsuit.  Specifically, Dr. Chau has claimed that the statement in the *Four Corners* episode that he is CC-3 is false and defamatory.  Public disclosure of these limited portions of the PSR – to the extent they reveal CC-3's identity and documents evidencing the $200,000 payment – will assist the News Organizations in disproving Dr. Chau's libel claim.

Hon. Vernon S. Broderick
August 29, 2018
Page 10

Likewise, no privacy interests would be impaired through the release of this information: the criminal prosecutions of all three affected criminal defendants are complete (with only Ms. Piao awaiting sentencing) and Dr. Chau has already been identified as CC-3 on the floor of Australian Parliament and subsequently in the international news media.

At least one court has held that assisting a third party in the defense of another lawsuit where there was a concurrent danger of a fraud on the court justified release of portions of a PSR. In *United States v. Watkins*, 623 F. Supp. 2d 514 (S.D.N.Y. 2009), Judge Rakoff ordered disclosure of relevant portions of a criminal defendant's PSR to judicially estop the defendant from asserting contrary facts in a separate state civil lawsuit related to his financial condition. Just as in *Watkins*, Dr. Chau is making allegations in the Australian libel case that appear to be at odds with the evidence adduced in the Ashe Proceedings. The release of these limited portions of the PSR will prevent any potential miscarriage of justice.

If it would assist the Court in reaching its decision, counsel for the News Organizations respectfully request to be heard at any hearing in this matter.

Respectfully submitted,

Davis Wright Tremaine LLP

Robert D. Balin

RDB/kf/Encls.

cc:    Attorneys of Record (via ECF)